IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| TERESA D. HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:17CV971 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Teresa Harris ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on September 30, 2013, alleging a disability onset date of July 25, 2009. (Tr. at 17, 157-58.)[2] Her claim was denied initially (Tr. at 67-80, 94-98), and that determination was upheld on reconsideration (Tr. at 81-93, 104-11). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative

---

[1] Andrew Saul became Commissioner of Social Security on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul should be substituted for Nancy A. Berryhill as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Administrative Record [Doc. #8].

Law Judge ("ALJ"). (Tr. at 112-13.) Plaintiff, along with her attorney and an impartial vocational expert, attended the subsequent hearing on July 7, 2016. (Tr. at 17.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 31), and, on August 25, 2017, the Appeals Council denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-5).

II.     LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

2

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then the claimant is disabled. Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

"perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. <u>DISCUSSION</u>

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" between July 25, 2009, her alleged onset date, and December 31, 2013, her date last insured. Plaintiff therefore met her burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> fibromyalgia, arthritis, asthma, obesity, anxiety, irritable bowel syndrome (IBS)[,] and sleep apnea[.]

(Tr. at 19.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 20-21.) Therefore, the ALJ assessed Plaintiff's RFC through her date last insured as follows:

> [She could] perform light work as defined in 20 CFR 404.1567(b) except she was allowed an option to alternate between sitting and standing. [Plaintiff] was precluded from climbing or working around heights or dangerous equipment.

5

> She was limited to frequent but not constant right overhead reaching and occasional bending, stooping, squatting, and crawling. Additionally, [Plaintiff] was limited to the performance of simple, routine and repetitive tasks.

(Tr. at 21.) At step four of the analysis, the ALJ determined that all of Plaintiff's past relevant work exceeded her RFC. (Tr. at 30.) However, the ALJ determined at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in the national economy. (Tr. at 30-31.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 31.)

Plaintiff now raises three challenges to the ALJ's decision. First, she argues that the vocational expert's testimony, on which the ALJ relied at step five, conflicts with the Dictionary of Occupational Titles ("DOT"). Second, Plaintiff contends that the RFC fails to account for her moderate limitations in concentration, persistence, and pace as required by Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). Third, she maintains that the ALJ failed to follow the Social Security Administration's mandated procedure for evaluating fibromyalgia. After careful consideration of the record, the Court finds that none of the issues raised by Plaintiff merit remand.

A. Step five

Plaintiff first challenges the ALJ's reliance on the vocational expert's testimony at step five of the sequential analysis. Specifically, the Plaintiff contends that the vocational expert's testimony conflicted with the DOT as to all of the jobs identified, and that the ALJ failed to obtain a reasonable explanation for the conflicts. In Pearson v. Colvin, 810 F.3d 204 (4th Cir. 2015), the Fourth Circuit clarified the steps an ALJ must take to identify and resolve apparent

6

conflicts between a vocational expert's testimony and the DOT. Specifically, the Fourth Circuit held that, if an expert's testimony apparently conflicts with the DOT, the expert's testimony can only provide substantial evidence to support the ALJ's decision if the ALJ received an explanation from the expert explaining the conflict and determined both (1) that the explanation was reasonable and (2) that it provided a basis for relying on the expert's testimony rather than the DOT. Pearson, 810 F.3d at 209-10; see also Rholetter v. Colvin, 639 F. App'x 935, 938 (4th Cir. 2016).

In the instant case, Plaintiff contends that the vocational testimony on which the ALJ relied at step five of the sequential analysis conflicted with the DOT in two regards. First, Plaintiff contends that her RFC restriction to simple, routine, repetitive tasks was inconsistent with the reasoning levels required for each of the jobs identified by the vocational expert. The vocational expert testified that Plaintiff would be able to perform jobs that existed in significant numbers in the national economy such as cashier II, storage facility rental clerk, and small parts assembler. Plaintiff correctly notes that the jobs of cashier II and storage facility rental clerk both require a reasoning level of 3, defined as requiring the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations." See DICOT 211.462-010, 1991 WL 671840; DICOT 295.367-026, 1991 WL 672594. Previous cases in this Circuit have found an apparent conflict between jobs requiring a reasoning level of 3 and a claimant's limitation to jobs involving only simple, routine, repetitive tasks. See, e.g., Mullis v. Colvin, No. 1:11CV22, 2014 WL 2257188 (M.D.N.C. May 29, 2014) (Osteen, C.J.) (finding an apparent conflict between an RFC

7

limitation to simple, routine, repetitive tasks at a low production pace and low stress environment and a VE's testimony that Plaintiff could perform a job to which the DOT assigned a reasoning level of 3); see also Keller v. Berryhill, 754 F. App'x 193 (holding that "an apparent conflict exists between a limitation to *short and simple instructions* and Reasoning Development Level 3 occupations" and noting that "[i]n [a] December 2009 memorandum, the Social Security Administration's Director for the Division of Field Procedures advises Regional Chief ALJs that an apparent conflict exists between a limitation to simple tasks and Reasoning Development Level 3 jobs"). Here, as noted, Plaintiff's RFC included a limitation to simple, routine, repetitive tasks. At no point did the ALJ ask the VE to explain the inconsistency between Plaintiff's RFC and the DOT reasoning level 3 required to perform the jobs of cashier II and storage facility rental clerk, nor did the ALJ ever receive a "reasonable explanation for [this] discrepancy." See Pearson, 810 F.3d at 209.

As Defendant notes, however, the final job identified by the vocational expert, small parts assembler, remains. Although Plaintiff argues that the reasoning level of 2 required for this job also conflicts with her restriction to simple, routine, repetitive tasks, the Fourth Circuit recently decided Lawrence v. Saul, 941 F.3d 140 (4th Cir. 2019), confirming that there is no apparent conflict within the meaning of Social Security Ruling (SSR) 00-4p between a residual functional capacity for the "simple, routine, repetitive tasks of unskilled work" and the definition of reasoning level 2 in the Dictionary of Occupational Titles. The Fourth Circuit noted that "[i]n finding no apparent conflict between 'simple, routine, repetitive' and Level 2 reasoning, we join every other circuit to consider the issue." Lawrence, 941 F.3d at 143 n.8. Accordingly, Plaintiff fails to show an apparent conflict between the DOT and the vocational

expert's testimony that Plaintiff could perform reasoning level 2 work as a small parts assembler. Thus, even if the ALJ failed to resolve an apparent conflict regarding the first two representative occupations, that error was harmless, because the other identified occupation of small parts assembler (with 206,000 jobs nationally) exists in significant numbers.

In her second challenge at step five, Plaintiff argues that all three jobs identified by the vocational expert could conceivably be inconsistent with the sit/stand option included in both the RFC and the hypothetical question to the vocational expert. However, to the extent that Plaintiff "essentially presses the Court to find a *per se* apparent conflict between the VE and the DOT in cases involving a claimant limited to light work with a sit/stand option . . . federal district courts in North Carolina, including members of this Court, have not found an apparent conflict to exist in such circumstances." See Baxley v. Berryhill, No. 1:17CV1048, 2018 WL 5817377, at *6 (M.D.N.C. Nov. 6, 2018) (collecting cases). Indeed, Plaintiff herself acknowledges that the expert's "testimony was not inconsistent with the DOT because the DOT does not address the option to alternate between sitting and standing." (Pl.'s Br. [Doc. #11] at 6) (emphasis added). Thus, there is no basis to find an apparent conflict between the DOT and the Vocational Expert's testimony.

Plaintiff nevertheless contends that, based on the job descriptions in the DOT, the addition of a sit/stand option could significantly reduce the number of positions available for each of the jobs named by the vocational expert. To support this assertion, Plaintiff cites information from the Bureau of Labor Statistics ("BLS"). However, the BLS is not a recognized vocational source under the Commissioner's regulations, and the ALJ is not required to address every potential conflict between the Vocational Expert's testimony and

9

other vocational publications. See Parker v. Berryhill, No. 1:17CV882, 2019 WL 653150, at *5 (M.D.N.C. Feb. 15, 2019) (citing 20 C.F.R. §§ 404.1566(d), 416.966(d)).[5] In addition, Plaintiff herself also acknowledges that no BLS job description aligns with the small products assembler position in the DOT. Looking at the specific DOT description for that position, a small products assembler, also known as a bench assembler, "frequently works at [a] bench as [a] member of [an] assembly group assembling one or two specific part and passing [the] unit to another worker." See DICOT 706.684-022, 1991 WL 679050. There is no basis to conclude that a sit/stand option would be inconsistent with the job duties and description for this position, and there does not appear to be an apparent conflict between the DOT description and the non-DOT limitation. Thus, remand is not required on this issue.

    B.    Concentration, persistence, or pace

Plaintiff next challenges the sufficiency of the mental restrictions included in the RFC. At step three of the sequential analysis, the ALJ determined that Plaintiff has moderate limitations in concentration, persistence, and pace. In Mascio, the Fourth Circuit explained that where such limitations are reflected at step three, the ALJ should address those limitations in assessing the RFC or should explain why the limitations do not affect the claimant's ability to work. The Fourth Circuit specifically held that "an ALJ does not account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work." Mascio, 780 F.3d at 638 (quotation omitted). This

---

[5] The Court also notes that, even accepting as true Plaintiff's assertions that, according to the BLS, a sit/stand option would eliminate 94.4% of cashier II positions, 71% of storage facility rental clerk positions, and approximately 88% of small products assembler positions, 168,000 cashier II positions, 124,700 storage facility rental clerk positions, and 24,720 small products assembler positions would remain, i.e., more than enough to constitute a significant number in the national economy.

10

is because "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." Id. The Fourth Circuit further noted that

> [p]erhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. But because the ALJ here gave no explanation, a remand is in order.

Id. (internal citation omitted). However, as previously noted in other cases in this District, the Fourth Circuit's decision in Mascio

> does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC. Rather, Mascio underscores the ALJ's duty to adequately review the evidence and explain the decision. . . .
>
> An ALJ may account for a claimant's limitation with concentration, persistence, or pace by restricting the claimant to simple, routine, unskilled work where the record supports this conclusion, either through physician testimony, medical source statements, consultative examinations, or other evidence that is sufficiently evident to the reviewing court.

Tolbert v. Colvin, 1:15CV437, 2016 WL 6956629, at *8 (M.D.N.C. Nov. 28, 2016) (quoting Jones v. Colvin, No. 7:14CV00273, 2015 WL 5056784, at *10-12 (W.D. Va. Aug. 20, 2015)).

In the present case, as in Mascio, the ALJ found moderate limitations in concentration, persistence, or pace at step three of the sequential analysis. (Tr. at 21.) Later in the sequential analysis, the ALJ formulated a mental RFC limiting Plaintiff to simple, routine, and repetitive tasks with no further mental restrictions. (Tr. at 21.) The issue, therefore, is whether the ALJ's discussion of, and reliance on, substantial record evidence adequately explains why Plaintiff's moderate limitation at step three did not translate into any additional RFC limitations. See,

11

e.g., Jones, 2015 WL 5056784, at *3-4; Del Vecchio v. Colvin, No. 1:14CV116, 2015 WL 5023857, at *5-6 (W.D.N.C. Aug. 25, 2015); Walker v. Colvin, No. 6:14-cv-00025, 2015 WL 5138281, at *11 (W.D. Va. Aug. 31, 2015). After careful review of the evidence and the ALJ's discussion thereof, the Court concludes that the ALJ's determination was sufficient to comply with Mascio.

In making his step three finding, the ALJ noted Plaintiff's testimony that "she has problems with her memory." (Tr. at 21.) In particular, Plaintiff testified that, "when reading[,] she usually has to read a paragraph more than one time," and that "she has problems following along when watching a television program during a 'bad' fibromyalgia flare." (Tr. at 21.) However, the ALJ also noted Plaintiff's testimony that "she drives herself to the grocery store once or twice a week," "spends time reading to keep her mind occupied," and does "seek/find puzzles for 10 to 15 minutes." (Tr. at 21.)

Later in the opinion, the ALJ discussed Plaintiff's allegations regarding her anxiety and depression at length, but he again discounted Plaintiff's "testimony about the severity and limiting effects of her psychiatric symptoms prior to her date last insured." (Tr. at 27-28.) In particular, the ALJ emphasized that Plaintiff received no psychiatric treatment during the time at issue, and that her reported depressive symptoms were well controlled through medication prescribed by her family practice physician, Dr. Claudine Corbett, beginning in January 2012. (Tr. at 28, 651, 656.) Just two months later, in March 2012, Plaintiff reported to Dr. Corbett that her mood had improved and that she no longer felt the need to be on medication for depression. (Tr. at 28, 657.) The ALJ's decision also reflects that "the State agency consultants found no indication of a medically determinable mental impairment in the evidence available

12

to them." (Tr. at 29; see also Tr. at 73, 86.) Nevertheless, giving Plaintiff "considerable benefit of the doubt," the ALJ found that Plaintiff suffered from depression and anxiety prior to her date last insured, and that these impairments "required monitoring and medications." (Tr. at 28.) He then found as follows:

> [D]espite [Plaintiff's] mental health problems, she was still able to take care of her personal care needs, think, communicate, act in her own interest[,] and get along with others. As such, the undersigned concludes that prior to the date last insured, although [Plaintiff] was unable to perform work[] which was of high stress and was precluded from work involving complex or detailed tasks, which is required of skilled work, she was not precluded from work involving simple, routine[,] and repetitive tasks.

(Tr. at 28.) In sum, the ALJ repeatedly explained his analysis of Plaintiff's mental impairments prior to the date last insured and explained that while her testimony, accepted to the fullest extent possible, evidenced that she was unable to maintain attention or concentration long enough for "complex or detailed tasks," it further indicated that she could drive, solve puzzles for 10-15 minutes, and perform other tasks which showed an overall capacity for simple, routine, repetitive work. Accordingly, the Court finds that substantial evidence supports the ALJ's RFC finding.

C. Fibromyalgia

Finally, Plaintiff contends that the ALJ failed to follow the Social Security Administration's mandated procedures with regard to Plaintiff's fibromyalgia. In particular, Plaintiff asserts that the ALJ failed to properly consider Plaintiff's subjective statements with regard to that impairment. Social Security Ruling 12-2p ("SSR 12-2p") "provides guidance on how [factfinders] develop evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how [factfinders] evaluate fibromyalgia in disability claims

and continuing disability reviews under titles II and XVI of the Social Security Act." 2012 WL 3104869, at *1. As another court within the Fourth Circuit explained, SSR 12-2p does not mandate "a finding that a claimant with a severe impairment of fibromyalgia automatically has non-exertional limitations preventing them from performing a full range of light work." Kurowski v. Colvin, No. 4:12CV137, 2013 WL 5306649, at *3 (E.D. Va. Sept. 18, 2013).

> Although the ruling acknowledges that fibromyalgia is a condition "characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues," it notes that "[a]s with any claim for disability benefits . . . we must ensure that there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity." 2012 WL 3104869, at *2. And the ruling explicitly contemplates that claimants with a severe impairment of fibromyalgia may or may not succeed at the fourth step of the Commissioner's analysis, and may or may not have nonexertional limitations. It explains that at that step "we use our RFC assessment to determine whether the person is capable of doing any past relevant work. . . . If the person is able to do any past relevant work, we find that he or she is not disabled." Id. at *6. It continues: "People with [fibromyalgia] *may* also have nonexertional physical or mental limitations because of their pain or other symptoms." Id. (emphasis added).
>
> In sum, the ruling requires the Commissioner to undergo the normal sequential analysis that it would for any disability and weigh whether any nonexertional symptoms would preclude a claimant from performing a given range of work.

Id.

In the present case, Plaintiff specifically contends that the ALJ failed to conform to SSR 12-2p in finding that her testimony regarding the intensity, persistence, and limiting effects of her fibromyalgia symptoms was not entirely consistent with the evidence. However, SSR12-2p specifically sets out how to evaluate an individual's statements about her symptoms and functional limitations, by following the familiar two-step process set out in the regulations. Under those applicable regulations, the ALJ's decision must "contain specific reasons for the

weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p; see also 20 C.F.R. § 404.1529.[6] In Craig v. Chater, the Fourth Circuit addressed the two-part test for evaluating a claimant's statements about symptoms. Craig, 76 F.3d at 594-95. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. at 594 (citing 20 C.F.R. § 416.929(b)); see also 20 C.F.R. § 404.1529(b). If the ALJ determines that such an impairment exists, the second part of the test then requires him to consider all available evidence, including Plaintiff's statements about her pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." Craig, 76 F.3d at 596.

This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit her ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings" Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 404.1529(c)(3):

(i) [Plaintiff's] daily activities;

(ii) The location, duration, frequency, and intensity of [Plaintiff's] pain or other symptoms;

---

[6] The ALJ's decision is dated March 30, 2016, and the Court therefore considers SSR 16-3p, effective March 28, 2016. See SSR 16-3p n.27 ("Our adjudicators will apply this ruling when we make determinations and decisions on or after March 28, 2016. When a Federal court reviews our final decision in a claim, we expect the court will review the final decision using the rules that were in effect at the time we issued the decision under review.").

15

> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms;
>
> (v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [her] pain or other symptoms;
>
> (vi) Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

Where the ALJ has considered these factors and has heard Plaintiff's testimony and observed her demeanor, the ALJ's determination is entitled to deference. See Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

In the present case, the ALJ determined that Plaintiff's fibromyalgia was a medically determinable impairment and that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the evidence for the reasons explained in this decision." (Tr. at 22.) Therefore, Plaintiff's challenge hinges on step two of the Craig analysis. This is consistent with SSR 12-2p, which provides that fibromyalgia which is determined to a medically-determinable impairment "satisfies the first step of our two-step process for evaluating symptoms." However, in evaluating fibromyalgia at the second step, as with any other symptom evaluation, the ALJ considers "the intensity and persistence of the person's pain or any other symptoms and determine[s] the extent to which the symptoms limit the person's capacity for work." SSR 12-2p.

16

It is undisputed that at step two of the analysis, the ALJ should not reject a claimant's statements "about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements." 20 C.F.R. § 416.929(c)(2). Thus, "subjective evidence of pain intensity cannot be discounted solely based on objective medical findings." Lewis, 858 F.3d at 866. However, it is also undisputed that a plaintiff's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities [only] to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as <u>consistent</u> with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(c)(4) (emphasis added). Thus, objective medical evidence and other evidence in the record are "crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work" and "[a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." Hines, 453 F.3d at 565 n.3 (quoting Craig, 76 F.3d at 595); see also SSR 16-3p ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities."). According to the regulatory guidance:

> If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other

17

evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work related activities . . . . In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities.

SSR 16-3p.

In the present case, a thorough review of the ALJ's decision and the record as a whole reveals that the ALJ properly considered both objective medical evidence and other evidence and explained that determination in the decision. Moreover, in doing so, the ALJ "considered information in the record that might lead to nonexertional limitations" from fibromyalgia. Kurowski, 2013 WL 5306649, at *3. The ALJ noted that "prior to the date last insured, the medical evidence simply does not show the objective findings and clinical signs that one would expect to see in an individual with the degree of symptoms and limitations alleged by [Plaintiff]." (Tr. at 22.) For example, the ALJ specifically noted that, in direct contradiction to Plaintiff's testimony that pain and swelling in her hands prevent her from performing basic of daily functions, such as tying her shoes and buttoning her clothing, that Plaintiff had no swollen joints upon examination and, "despite some trigger-point tenderness, there is no evidence of a resultant inability to perform fine and gross movements." (Tr. at 22, 23, 298, 589, 590, 591, 593.)[7] Similarly, the ALJ noted that Plaintiff's exams consistently showed full muscle strength and tone, despite her testimony that she could barely lift a gallon of milk with both hands. (Tr. at 22, 24, 25, 587, 608.) The ALJ further recounted that in February 2013,

---

[7] Later in his decision, the ALJ considered Plaintiff's reports of "fairly limited" daily activities, but he ultimately concluded that the strength of these reports was "outweighed by the other factors discussed in this decision." (Tr. at 29.)

18

Plaintiff's rheumatologist, Dr. Philip Stapleton, "spent a great deal of time discussing the benefits of weight loss, regular exercise, and a good sleep cycle for the management of fibromyalgia syndrome with [Plaintiff]." (Tr. at 26, 606; see also Tr. at 587, 592, 601, 605, 608, 610, 620, 656.) However, the ALJ also chronicled Plaintiff's ongoing lack of compliance with CPAP therapy and failure to exercise as directed. (Tr. at 26, 27, 28, 587, 604, 606, 618.) The ALJ found that compliance with treatment "proved beneficial to [Plaintiff's] overall health and well-being" but that the medical evidence reflected multiple instances of failing to comply with treatment recommendations. (Tr. at 26-27.) As SSR 16-3p specifically provides, "if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." 2016 WL 1119029, at *8. The ALJ also found that Plaintiff's medical records suggested that prior to the date last insured, her fibromyalgia problems were responsive to medications, and her stable findings reflected that her pain was adequately managed by the treatment she received. (Tr. at 25.) Finally, the ALJ found that the evidence did not show any significant worsening around her alleged onset date that led to the cessation of work activity. (Tr. at 29).[8]

Ultimately, the ALJ gave Plaintiff "the benefit of the doubt regarding her allegations to the extent possible based on the objective medical evidence, which show[ed] only minimal abnormalities." (Tr. at 29.) In particular, he concluded that Plaintiff was limited to "'light' work as opposed to 'medium' work as indicated by the [State agency medical] consultants,"

---

[8] Plaintiff's submissions reflect that she asserted that her condition became severe enough to preclude work as of July 25, 2009, that she had previously stopped working in February 2008 (Tr. at 201) when the company she worked for was bought out and they "let everybody go" (Tr. at 42), and that she subsequently attended community college classes and completed her CNA in 2010 and GED in 2011 (Tr. at 189).

19

and he "also incorporated the manipulative limitations noted [in the consultants'] reports." (Tr. at 29.) The ALJ then noted that, "based on the evidence presented at the hearing level and giving some weight to [Plaintiff's] testimony at the hearing, [he] incorporated postural limitations due to [Plaintiff's] diagnoses of fibromyalgia, arthritis, sleep apnea[,] and obesity." (Tr. at 29.) Because the ALJ properly considered not only the objective medical findings, but also Plaintiff's testimony and the factors set out in Social Security Rulings 12-2p and 16-3p, the Court finds no error in the ALJ's subjective symptom evaluation.

Having considered all of the alleged assignments of error, the Court notes that ultimately the issue before the Court is "whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ reviewed the evidence, explained the decision, and supported that explanation with substantial evidence. Accordingly, the Court finds no basis for remand.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion to Reverse the Decision of the Commissioner [Doc. #10] be DENIED, that Defendant's Motion for Summary Judgment [Doc. #12] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 2nd day of January, 2020.

/s/ Joi Elizabeth Peake  
United States Magistrate Judge